# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ANTHONY H. WILLIAMS., | |
| Plaintiff, | |
| v. | Case No. 15-CV-317-JPS |
| SUE NYGREN, KRISTIN VASQUEZ, MICHAEL HOWARD, PAUL KEMPER, RONALD MALONE, and NURSE JANE/JOHN DOE, | |
| | ORDER |
| Defendants. | |

Plaintiff, Anthony Williams ("Williams") brought this action under 18 U.S.C. § 1983 claiming that the defendants violated his civil rights. (Docket #1). Specifically, Williams alleges that Sue Nygren ("Nygren") and Kristin Vasquez ("Vasquez")[1] violated the Eighth Amendment by failing to ensure that he received proper medical care following a knee injury that Williams sustained while playing basketball. (Docket #1). Williams also claims that Paul Kemper ("Kemper"), Michael Howard ("Howard"), and Ronald Malone ("Malone") acted negligently by failing to maintain the basketball court in a safe condition. (Docket #1).

Both Williams and the defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket #54, #66). As described more fully herein, the Court concludes that: (1) Nygren and

---

[1] In his motion for summary judgment, Williams also claims that the other three defendants, Paul Kemper, Ronald Malone and Michael Howard, violated the Eighth Amendment. (Docket #55 at 1-2). However, the Court explicitly dismissed these defendants from Williams' initial Eighth Amendment claim in its screening order. (Docket #10 at 6). Thus, the Court will not consider their liability under the Eighth Amendment.

Vasquez are not liable for violating Williams' Eighth Amendment rights; and (2) Kemper, Howard and Malone are entitled to governmental and recreational immunity. Thus, the defendants' motion for summary judgment will be granted (Docket #66), and Williams' motion for summary judgment will be denied (Docket #54).

1. BACKGROUND[2]

1.1 The Parties

Racine Correctional Institution ("RCI") is a state-owned medium security institution located in Sturtevant, Wisconsin. (Docket #68 ¶ 1). Williams is an inmate at RCI. (Docket #68 ¶ 22). The impetus of this complaint was an injury that Williams sustained on June 30, 2014, while playing basketball on the court adjacent to the prison's Milwaukee Unit, where he lived. (Docket #68 ¶ 22).

The defendants are either current or former employees at RCI. (Docket #68 ¶¶ 3-15).

More specifically, at all times relevant, Nygren was the Health Services Unit ("HSU") Manager and Vasquez was the HSU Assistant Manager at RCI. (Docket #68 ¶¶ 11, 14). Both of the defendants' positions required them to work with the primary care physicians, dentists, psychiatrists, and specialists serving as consultants to the Bureau of Health Services (BHS) in a collaborative manner to provide quality health care at RCI in an efficient and effective manner. (Docket #69 ¶ 4; Docket #70 ¶ 4). In addition, each assisted in providing the overall administrative support and

---

[2] The facts will generally be taken from the parties' proposed findings of fact (Docket #56, #68) and the parties' responses thereto (Docket #74, #92), unless otherwise indicated. Any disputes of fact will be noted accordingly.

direction of HSU. (Docket #69 ¶ 4; Docket #70 ¶ 4). Though Williams disputes the nature of supervisory roles within the HSU, neither Nygren nor Vasquez directed Williams' treatment or care plans for his knee injury.[3] (Docket #68 ¶ 47).

In addition, at all times relevant, Kemper was the Warden, Malone was the Deputy Warden, and Howard was the Unit Manager for the Milwaukee Unit at RCI. (Docket #29 ¶¶ 3, 5, 9). Matters involving maintenance of buildings and grounds were routinely addressed by staff members of the Building and Grounds Department. (Docket #68 ¶ 29). Kemper generally holds monthly meetings with the Buildings and Grounds Superintendent to discuss on-going maintenance issues and to prioritize and plan for future projects. (Docket #68 ¶¶ 30-31). During the relevant time period, those regularly in attendance at these meetings were Kemper, Malone, the supervisor of maintenance (Stan Potratz), and the correctional management services director. (Docket #68 ¶¶ 29-30). Since the 2013-2014 time period, the Building and Grounds Superintendent has discussed the

_____

[3]More to the point, Williams disputes what "direct patient care" means. (Docket #92 ¶ 47). He suggests that because Nygren and Vasquez had custody of Williams' medical records, oversaw HSU staff, and reviewed inmate interview/HSU requests, they provided "direct patient care" to him and were, therefore, his "primary care providers." (Docket #92 ¶¶ 47, 50). Williams does not contest, however, that Nygren and Vasquez were indeed supervisors. (Docket #92 ¶ 48). For their part, the defendants clarify that Williams' "primary advance care providers" were Nurse Practitioner Lora Blasius ("Blasius") and Dr. Enrique Luy ("Dr. Luy"); these two providers were the medical professionals at RCI that determined what course of treatment to pursue in relation to Williams' injuries. (Docket #68 ¶ 48). The defendants further assert that Nygren and Vasquez did not have the authority to: (1) overturn decisions made by Williams' advance care providers; or (2) to prescribe medications. (Docket #68 ¶¶ 49, 51). Though Williams disputes the scope of the supervisors' authority, he provides no basis for his assertions. (Docket #92 ¶ 49).

possibility of resurfacing[4] the seven courts in the prison, subject to budget constraints. (Docket #56 ¶¶ 23-25; Docket #68 ¶¶ 32, 36). So far, only the Dane Unit courtyard has been resurfaced, because none of the courts were considered to be in such disrepair as to constitute a hazard to the inmates playing on them. (Docket #68 ¶¶ 34, 35).

### 1.2 The Basketball Injury

Williams injured his knee on June 30, 2014, while he was playing basketball on the court adjacent to the Milwaukee Unit. (Docket #68 ¶ 22). The defendants assert that at no time prior to Williams' injury: (1) was Kemper, Malone or Howard informed that there was an unsafe condition on the Milwaukee Unit basketball court; (2) was Kemper or Malone aware of any issues with the condition of the Milwaukee Unit's court; or (3) was Kemper made aware of any repeated injury-related problems attributable to the condition of the basketball courts.[5] (Docket #68 ¶¶ 23-25). Kemper,

---

[4]The maintenance staff also regularly maintains the concrete surfaces around the courts by searching for and shaving down trip hazards. (Docket #68 ¶ 37). This is generally done seasonally due to heaving of surfaces after the winter season is over. (Docket #68 ¶ 37).

[5]It is undisputed that Williams submitted two interview requests—one directed to Howard and one directed to Kemper—regarding the basketball court's re-surfacing. (Docket #71, Ex. 1; Docket #73, Ex. 1). Each of these requests states "[l]ast year a level surface to play basketball was requested. Dane Unit received theirs, but other units such as Milwaukee are unsafe…." (Docket #71, Ex. 1; Docket #73, Ex. 1). Though neither of the interview request forms are dated, both Howard and Kemper state in their declarations that Williams' requests were made *after* his injury. (Docket #71 ¶ 7; Docket #73 ¶ 13). Williams disputes these assertions without providing any specific date of contact. (Docket #92 ¶¶ 23-25). Nor does Williams provide any evidence that: (1) other injuries occurred on the Milwaukee Unit basketball court; or (2) any injuries on the Milwaukee Unit court had been reported to Kemper, Malone or Howard. (Docket #56 ¶ 15).

Malone and Howard regularly walked the grounds of the prison and personally observed the surfaces of the basketball areas, including the Milwaukee Unit court. (Docket #68 ¶ 40). Though Kemper and Malone "knew" that the basketball court had "cracks," neither Kemper, Malone nor Howard had perceived the condition of the court to constitute a safety hazard. (Docket #56 ¶¶ 16-17, 19-20; Docket #68 ¶ 40). There was no warning on the exterior of the courtyard or in the inmate handbook regarding the risks of playing in that area. (Docket #56 ¶¶ 15, 18).

Nonetheless, while engaging in a recreational game of basketball on the Milwaukee Unit court, Williams heard his knee "pop." (Docket #68 ¶ 61). Immediately following the injury, Williams was taken to the HSU[6] (Docket #67 ¶ 61) and thereafter to the Wheaton Franciscan Hospital emergency room (Docket #68 ¶ 62). Williams had x-rays completed of his left knee and was given a knee immobilizer along with crutches and instructions. (Docket #68 ¶ 63; Docket #56 ¶ 9). The parties do not dispute that the emergency room

---

[6]Williams alleges that Vasquez was, in fact, working on June 30, 2014, in the HSU and that she knew of his injury because she was present that day. (Docket #56 ¶ 6). The defendants do not dispute the content of Ms. Vasquez's interrogatory response, which indicates that she was working in HSU the day that Williams was injured and "saw" that he was injured. (Docket #74 ¶ 6; Docket #85, Ex. 1 at 18). The defendants maintain, however, that she did not provide Williams direct patient care at that time. (Docket #74 ¶ 6).

Page 5 of 28

doctor's discharge note states that Williams should follow up with an orthopedic ("ortho") specialist within 3-5 days.[7] (Docket #92 ¶ 63).

That same day, Williams was discharged from the emergency room and returned to RCI with discharge instructions for treatment and home care. (Docket #68 ¶ 65). A medication order for Vicodin was also approved by the on-call doctor. (Docket #68 ¶ 66).

Over the course of the next two weeks, Williams was seen three times by various nurses (Paige Mueller, Debra Nutting, Tamia Chapple) and Dr. Luy in the HSU. (*See* Docket #69 ¶¶ 22-25) (describing Williams' HSU visits on July 1, July 3, and July 13, 2014). Though Williams does not describe any conversations that he had in the HSU at this time, he does allege that "HSU staff knew" about his required follow up appointment with an ortho specialist and nonetheless failed to schedule it. (Docket #56 ¶ 3). Rather, on July 14, 2014, Blasius scheduled Williams' initial appointment at Wheaton Franciscan ortho clinic for July 28, 2014. (Docket #56 ¶ 4; Docket #69 ¶ 25). The two-week delay between scheduling and the actual appointment was allegedly due to the ortho physician's availability. (Docket #56 ¶ 8; Docket #85, Ex. 1 at 20).

---

[7]However, when this initial ortho appointment was actually scheduled by RCI staff is disputed. (Docket #92, Ex. 1 ¶ 63). The defendants' proposed findings of fact suggests that the initial ortho appointment was made on June 30, 2014. (Docket #67 ¶ 63). In support, they cite to Nygren's declaration. (Docket #68 ¶ 63). However, Nygren's declaration states that Blasius ordered a follow-up with Wheaton Franciscan Hospital's ortho clinic on July 14, 2014. (Docket #69 ¶ 25). Williams appears to agree that the initial ortho appointment was scheduled by Blasius on July 14, 2014. (Docket #92 ¶ 25). In either case, and as discussed more fully below, to the extent a dispute of fact exists on this date, it is not material.

In light of the purported delay in scheduling the ortho appointment, Williams submitted multiple Health Services Requests ("HSR").[8] (Docket #1, Ex. 3). Williams' second HSR asked how his initial ortho appointment could have been "forgotten." (Docket #1, Ex. 3). On July 26, 2014, Nygren responded to Williams' second HSR by explaining that the HSU had to ensure the physician's availability before scheduling an outside appointment. (Docket #1, Ex. 3). She also stated that Williams "had an appointment [with HSU] earlier this week."[9] (Docket #1, Ex. 3).

Williams was indeed seen by an ortho specialist on July 28, 2014. (Docket #69 ¶ 27). Dr. Goran Jankovic ("Dr. Jankovic"), the treating physician at Wheaton Franciscan, ordered an MRI of Williams' left knee and a follow up appointment after the completion of the MRI. (Docket #69 ¶ 28). Blasius ordered that MRI on August 1, 2014. (Docket #69 ¶ 29).

Upon returning to RCI, Williams submitted another HSR request to follow up on: (1) the delay between his emergency room visit and initial ortho appointment; and (2) the status of his MRI.[10] (Docket #69, Ex. 1 at 122).

---

[8]Williams does not state on which day he sent this HSR. On the one hand, in his complaint he states that he began the HSR process on July 12, 2014. (Docket #1 at 2; Docket #1, Ex. 3) (labeling the HSR that Nygren responded to as Williams' "second" request). On the other hand, Williams does not dispute the defendants' proposed findings of fact that HSR's are triaged daily at 6:00 a.m. and responded to based on their priority within seven calendar days. (Docket #99 ¶¶ 54-55). Thus, the HSR was likely received some time between July 19, 2014, and July 26, 2014.

[9]Though Nygren's note was not explicit as to what appointment she was referring to, it is undisputed that Williams had an appointment with Blasius on July 14, 2014—8 days prior to Nygren's HSR response.

[10]Nygren alleges that Williams submitted this HSR on August 8, 2014. (Docket #69 ¶ 68). Williams does not dispute this. (Docket #92 ¶ 68).

Nygren responded to this HSR on August 8, 2014. (Docket #69, Ex. 1 at 122). Nygren explained that: (1) outside orders are only recommendations for HSU staff; (2) all outside medical orders must be initiated by RCI's medical providers; (3) Williams' initial diagnosis was that of a knee sprain; and (4) an MRI for his left knee had been scheduled. (Docket #69, Ex. 1 at 122).

On August 4, 2014, Blasius completed a review summary for Williams' visit to the Wheaton Franciscan ortho specialist. (Docket #69 ¶ 30). Approximately two weeks later, she noted that Williams had a patellar tendon rupture and that Williams would be referred to an orthopedic surgeon.[11] (Docket #69 ¶ 32). That same day, August 20, 2014, Vasquez received a call from Williams' mother to check on the status of his care. (Docket #68 ¶ 70). Vasquez entered a note in Williams' medical record detailing this call. (Docket #68 ¶ 70).

Williams was seen by Wheaton Franciscan Hospital's radiology department on August 26, 2014. (Docket #69 ¶ 33). At this time, Dr. Jankovic completed an MRI of Williams' left knee. (Docket #69 ¶ 34). Dr. Jankovic also ordered future labs and procedures. (Docket #69 ¶ 36).

Two days later, Williams filed an inmate complaint and continued to prepare for surgery. (Docket #69 ¶ 37; Docket #79 at 6-7). First, Williams' inmate complaint reiterated his objection to the delay in his initial ortho appointment. (Docket #79 at 6-7). In addition, he completed a surgery consultation at Wheaton Franciscan Hospital. (Docket #79 at 6-7). Williams' surgery was scheduled the next day for September 12, 2014. (Docket #68 ¶ 72). In light of this surgery, Vasquez placed a medical hold on Williams'

---

[11]The parties do not explain how Blasius received this diagnosis. (Docket #69 ¶ 28; Docket #69 ¶¶ 33-34).

Page 8 of 28

record to prevent him from being transferred to another institution. (Docket #68 ¶ 74).

About two weeks later, Michelle Bones, Inmate Complaint Reviewer, dismissed Williams' inmate complaint. (Docket #79 at 6-7). When reviewing the allegations, the decision indicates that Ms. Bones primarily relied on the treatment summary provided to her by Vasquez. (Docket #79 at 6-7). Ms. Bones specifically noted that Blasius was Williams' primary care provider and concluded that the HSU staff indeed had not "forgotten" about Williams, as evidenced by the four appointments he had received prior to seeing the orthopedic specialist on July 28, 2014. (Docket #79 at 6-7). In addition, Ms. Bones noted that Williams had received an MRI on August 26, 2014, and was scheduled for surgery on September 12, 2014. (Docket #79 at 6-7). Because there were no facts to suggest that Williams' care was deficient, Ms. Bones dismissed the complaint. (Docket #79 at 6-7).

Two later days, on September 12, 2014, Williams underwent knee surgery. (Docket #67 ¶ 73).

Following the procedure, Williams was seen in the HSU on four different occasions between September 12, 2014, and September 18, 2014.

(Docket #68 ¶ 75). Williams's final appointment at the Wheaton Franciscan Hospital Ortho Clinic was on September 22, 2014.[12] (Docket #68 ¶ 77).

Less than a week after the surgery, however, an ultra-sound completed at Wheaton Franciscan Hospital revealed that Williams appeared to be positive for a Deep Vein Thrombosis ("DVT"). (Docket #68 ¶ 76). Shortly thereafter, Williams was diagnosed with a DVT and was prescribed Endxaparin (also known as Lovenox) and Warfarin. (Docket #68 ¶ 78). Discharge instructions from Wheaton Franciscan outlined the causes, symptoms, and prevention methods for DVTs. (Docket #69 ¶ 52).

---

[12]Williams disputes that he attended this appointment. (Docket #92 ¶ 77). However, Williams' medical records reveal that he did have a scheduled appointment on September 22, 2014. (Docket #69 at 2). Williams provides no evidence that he did not attend this appointment. Thus, the Court must adopt the defendants' proposed fact that Williams did indeed attend his appointment. *See Burton v. Downey*, No. 14-3591, slip op. at 10 (7th Cir. Oct. 8, 2015) (citing *Scott v. Harris*, 500 U.S. 372, 380 (2007) ("[W]hen opposing parties tell two difference stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the fact for purposes of ruling on a motion for summary judgment."). Moreover, regardless of this dispute, it is undisputed that neither Nygren nor Vasquez were aware of any alleged need and/or delay of a post-surgery or a follow up ortho appointment. The defendants present no proposed facts in this regard, presumably because Williams did not present this theory of liability until his opposition to the defendants' motion for summary judgment. (*See* Docket #1).

Case 2:15-cv-00317-JPS   Filed 02/26/16   Page 10 of 28   Document 103

In light of his DVT diagnosis, Williams began taking Endxaparin and Warfarin.[13] (Docket #68 ¶ 78). Though Williams was prescribed to take Endxaparin for seven (7) days, Blasius allegedly discontinued the Endxaparin prescription after only a five (5) day regimen. (Docket #1, Ex. 6 at 3). Williams' medical notes do not explain why Blasius made the decision to discontinue that prescription. (Docket #69, Ex. 1 at 16).

Williams, noting this discrepancy, filed an HSR. (Docket #1, Ex. 6 at 3). Vasquez replied to this HSR on October 1, 2014, stating that, "the Lovenox [Endxaparin] was discontinued 9-26-14. You have a current order for Cumadin (warfarin), please take as directed." (Docket #1, Ex. 6 at 3).

Williams subsequently filed an inmate complaint related to his Endxaparin prescription on October 7, 2014. (Docket #79 at 22). That complaint was dismissed, however, on October 27, 2014. (Docket #79 at 22). The Inmate Complaint Reviewer that processed Williams' complaint, Steven Linn, noted that Blasius: (1) had a laboratory draw completed on the day that Williams discontinued the Endxaparin; (2) continued to follow-up with Williams after discontinuing the Endxaparin; and (3) treated Williams according to his condition. (Docket #79 at 22). Both Vasquez and Nygren

---

[13]Williams' medical records state that he was ordered to begin taking the Endxaparin and Warfarin on either September 19, 2014, or September 18, 2014. (Docket #1, Ex. 6 at 1; #69, Ex. 1 at 40). Thereafter, it is not clear when Williams actually began taking his medication. On the one hand, the defendants proposed findings of fact suggest that Williams began taking Endxaparin and Warfarin on September 24, 2014. (Docket #68 ¶ 78). On the other hand, Williams' Inmate Complaint decision, processed by Steven Linn, states that Williams began taking these medications on September 20, 2014. (Docket #79 at 22). As discussed below, however, these exact dates are immaterial.

appear to have been carbon copied on this complaint decision on October 27, 2014. (Docket #79 at 22).

2. LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where...the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment, it "reflects the court's judgment that one or more material facts are disputed or that the

facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3.    ANALYSIS

    3.1    Eighth Amendment Claim

Williams' Eighth Amendment claim is asserted against RCI's HSU supervisor, Nygren, and HSU assistant supervisor, Vasquez. *(See generally* Docket #1). Specifically, Williams raises four specific complaints: (1) that his initial follow up ortho appointment was not made in a timely manner; (2) that his MRI was not scheduled in a timely manner; (3) that his blood-thinning medication, Endxaparin, was not administered properly; and (4) that he was never taken to his final post-surgery ortho appointment.[14] (Docket #91 at 7).

The Eighth Amendment protects prisoners from a state actor's "deliberate indifference to his basic needs." *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). In order to prove a state actor's failure to provide adequate medical treatment, a prisoner must show that: (1) he/she had a serious medical need; and (2) the defendant(s) was deliberately indifferent to it. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). An objectively

---

[14]Williams did not allege this last theory in his complaint. (*See* Docket #1). Rather, in his opposition to the defendants' motion for summary judgment and in "response" to Nygren's declaration, he adds the argument related to his post-surgery appointments. (Docket #91 at 7; Docket #92 at 3-7). The Court did not initially screen this theory of liability (Docket #10) and, thus, Williams cannot argue it here. *See Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."). However, as described below, even if these facts had been properly alleged in the complaint, they do not make out a showing of deliberate indifference against Nygren or Vasquez.

serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zentmyer v. Kendall County, Illinois*, 220 F.3d 805, 810 (7th Cir. 2000) (internal citations omitted). Moreover, deliberate indifference entails more than "mere negligence," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994), and requires the prisoner to show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety. *Id.* at 837.

In this regard, "[l]iability under § 1983 arises only when the plaintiff can show that the defendant was *personally responsible* for a deprivation of a constitutional right." *Zentmeyer*, 220 F.2d at 811 (emphasis added); *see also Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) ("Under § 1983, there is no respondeat superior liability."). Moreover, in order to be liable for a failure to intervene, "there must be some causal connection or affirmative link between the action complained about and the official sued…." *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). In other words, "supervisors cannot be 'vicariously liable' for the conduct of their subordinates." *Watts v. Westfield*, No. 10-CV-550-WMC, 2014 WL 3447080, at *4 (W.D. Wis. July 11, 2014) (citing *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 2796 (2013)). A supervisory official only "satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011); *Backes v. Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011)

Page 14 of 28

("They must…act either knowingly or with deliberate, reckless indifference.") (internal citations omitted).

The undisputed facts show that neither Nygren nor Vasquez demonstrated deliberate indifference with respect to Williams' medical treatment.[15] The Court will address each of Williams' arguments in turn.

First, Williams claims that Nygren and Vasquez acted deliberately indifferent because they failed to schedule his initial ortho follow-up appointment in a timely manner. (Docket #55 at 3). The parties do not dispute that the emergency room doctor's recommendation for follow-up ortho care was made on June 30, 2014 (Docket #92, Ex. 1 ¶ 65), and Williams' appointment for that visit was made by Blasius two weeks later, on June 14, 2014. (Docket #92 ¶ 25). Between these dates, various nurses, Blasius, and Dr. Luy treated Williams in the HSU. (Docket #92 ¶¶ 76-68).

There are no facts suggesting that either Nygren or Vasquez had knowledge of and facilitated, approved, condoned, or turned a blind eye to the scheduling of Williams' initial ortho appointment. *See Arnett*, 658 F.3d at 757. On the one hand, there is no evidence that Vasquez even knew of Williams' injury until over three weeks after[16] Williams saw the ortho

---

[15]The parties agree that Williams' knee injury was objectively serious for the purpose of his Eighth Amendment claim. (Docket #74 ¶ 5). Thus, the Court will devote this portion of the Order to discussing the issue in dispute—whether Nygren and/or Vasquez acted with deliberate indifference to Williams' knee injury.

[16]Even if Vasquez knew about Williams' injury and the basketball accident because she was on duty in the HSU on June 30, 2014, there is no evidence she knew of the emergency room doctor's order to follow up with an ortho specialist within 3-5 days.

specialist.[17] (Docket #68 ¶ 70) (explaining the call that Vasquez took from Williams' mother on August 20, 2014). On the other hand, the only evidence regarding Nygren's involvement with the initial ortho follow up appointment stems from two HSR's that Nygren responded to on: (1) June 26, 2014—*after* Williams' appointment had been scheduled; and (2) August 8, 2014—*after* Williams' appointment had occurred. (Docket #1, Ex. 3; Docket #68 ¶ 57). Even if Nygren had learned of Williams situation seven days prior to the HSR that she responded to on June 26, 2014,[18] Williams' appointment had already been scheduled by that date. (See Docket #92 ¶ 25). Moreover, Nygren was not Williams' primary advance care provider and, therefore, did not direct Williams' medical care. (Docket #69 ¶ 9). This meant that Nygren: (1) was not actively treating Williams; (2) did not have the authority to determine what course of treatment to pursue in relation to Williams' injury; and (3) did not have the ability to overturn the care decisions that were being made by the HSU nurses, Blasius and Dr. Luy. (Docket #69 ¶ 9).

---

[17]Likewise, the fact that Vasquez: (1) placed a medical hold on Williams to prevent him from being moved to another institution; and (2) was carbon copied on October 27, 2014, with an email resolving Williams' inmate complaint, does not further Williams' theory that Vasquez participated in delaying his initial appointment. (Docket #68 ¶¶ 70, 74; Docket #79 at 22).

[18]Seven days prior to June 26, 2014, would be June 19, 2014. (Docket #92 ¶ 25).

In short, there are no facts to suggest that: (1) Vasquez or Nygren *knew* that Williams needed a follow up appointment prior to it being scheduled on June 14, 2014; or (2) *acted* with deliberate, reckless indifference during the period of time in which Williams' ortho appointment had not yet been scheduled.[19] To the extent there was any delay in the initial ortho appointment's scheduling, the substandard medical care that Williams allegedly received was not committed by, nor can be found attributable to, Nygren and Vasquez. *See Monell v. Dep't of Social Services*, 436 U.S. at 699 n.58 (no respondeat superior liability under Section 1983).

Second, Williams argues that Vasquez and Nygren acted with deliberate indifference by delaying his MRI appointment. (Docket #55 at 3). Contrary to Williams' assertion, the MRI was not ordered by the emergency room physician. (*See* Docket #1, Ex. 1 at 3). Rather, Williams' MRI was ordered by Dr. Jankovic at Williams' initial ortho appointment on July 28, 2014. (Docket #69 ¶ 28). Blasius scheduled the MRI on the same day of Williams' initial appointment for August 26, 2014. (Docket #69 ¶¶ 29, 33-34; Docket #69 Ex. 1 at 24). There is no evidence to suggest Vasquez and Nygren had any involvement in scheduling or delaying that MRI appointment.

Third, Williams claims that Vasquez and Nygren were deliberately indifferent by failing to intervene with the administration of his Endxaparin prescription. (Docket #1 at 4). On the one hand, Vasquez became aware of

---

[19] Nor can these defendants be liable for the fact that it took from June 14, 2014, until June 28, 2014, for the appointment to occur. As Nygren explained in her response to Williams' HSR on July 26, 2014, the HSU staff can only schedule outside appointments when the outside doctors have availability. (Docket #99 ¶¶ 59, 47, 63). There is no evidence to suggest that either of the defendants played any role in delaying the appointment during this timeframe.

this situation sometime between September 26, 2014 (the day that Blasius discontinued Williams' Endxaparin prescription) and October 1, 2014 (the day when Vasquez responded to Williams' HSR). (Docket #1, Ex. 1, Ex. 6 at 2-3). On the other hand, Nygren only became aware of this situation when she was carbon copied on the resolution of Williams' inmate complaint on October 27, 2014. (Docket #79 at 22).

Importantly, however, on September 26, 2014, Williams' medical records indicate that Blasius, one of Williams' advance primary care providers, had *changed* Williams' seven-day Endxaparin prescription to a five-day regimen. (Docket #69, Ex. 16 at 16, 39). As the HSU supervisor and assistant supervisor, it is undisputed that after the medical professional prescribing his treatment changed Williams' medication, neither Nygren nor Vasquez had the authority to alter Blasius' decision to alter Williams' prescription. (Docket #69 ¶ at 10; Docket #70 at 9). At best, therefore, Williams' allegations—namely that he was dissatisfied with his prescription regimen and treatment plan—sound in medical malpractice, which cannot be remedied with an action under Section 1983. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts."); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (explaining that plaintiff's dissatisfaction or disagreement with course of treatment is not evidence of deliberate indifference).

Case 2:15-cv-00317-JPS   Filed 02/26/16   Page 18 of 28   Document 103

Finally, Williams asserts that the defendants' failure to ensure that he attended his final ortho appointment violated his Eighth Amendment rights.[20] (Docket #91 at 7). Beyond the fact that this argument was not raised in the screened complaint and, therefore, cannot be raised at summary judgment, the argument also has no factual support. (*See* Docket #1); *Abuelyaman*, 667 F.3d at 814. Williams' medical records indicate that he indeed attended a final orthopedic appointment on September 22, 2014. (Docket #69, Ex. 1 at 2); *see also Burton v. Downey*, No. 14-3591, slip op. at 10 (7th Cir. Oct. 8, 2015) (citing *Scott v. Harris*, 500 U.S. 372, 380 (2007) ("[W]hen opposing parties tell two difference stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the fact for purposes of ruling on a motion for summary judgment.")). Moreover, because Nygren and Vasquez were not involved in Williams' direct patient care before, during, or after the basketball accident, Williams fails to explain when, how, or if the defendants were made aware of his final follow up appointment needs. (Docket #69 ¶ 10; Docket #70 ¶ 9). Because there is no evidence that the defendants knew that the follow-up appointments were needed and/or delayed, the Court cannot conclude that either of the defendants acted with a sufficient degree of culpability so as to hold them liable under the Eighth Amendment.

In sum, there is simply no evidence from which to infer that Nygren or Vasquez acted with deliberate indifference towards Williams' medical

---

[20]Williams alleges that his final ortho appointments were scheduled for September 22, 2014, *and* October 23, 2014. (Docket #91 at 7).

needs.[21] The Court will grant the defendants' motion for summary judgment with respect to Williams' Eighth Amendment claim (Docket #66) and correspondingly deny Williams' motion for summary judgment on this claim. (Docket #54).

### 3.2 State Law Negligence Claim

Williams claims that Kemper, Malone and Howard acted negligently by failing to maintain the safety of the Milwaukee Unit basketball court and/or failing to warn inmates of the dangerous condition of that court. (Docket #55 at 2). However, this claim must fail because each of these defendants—as state employees—are entitled to governmental immunity and recreational immunity.

On the one hand, "[t]he rule of governmental immunity provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties." *Pries v. McMillon*, 2010 WI 63, ¶ 17, 326 Wis. 2d 37, 50, 784 N.W. 2d 648, 654. The "general rule for state employees is immunity and an exception must be demonstrated in order for this rule not to apply." *Kimps v. Hill*, 200 Wis. 2d 1, 10 n.6, 18-19, 546 N.W. 2d 151, 159 (1996) ("The general rule of immunity for state public officers stands in contrast to that for municipalities where, 'the rule is liability—the exception is immunity.'") (citing *Holytz v. City of*

---

[21]Because the Court finds that the Nygren and Vasquez are entitled to summary judgment as a matter of law on the Eighth Amendment claim, the Court need not address the defendants' remaining arguments. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (finding that when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity).

*Milwaukee*, 17 Wis.2d 26, 39, 115 N.W. 2d 618 (1962)). Governmental immunity is a question of law. *Pries*, 2010 WI at ¶ 17.

Two exceptions to the rule of governmental immunity for state employees are relevant in this case: the ministerial duty exception and the known danger exception. *Id.* With regard to the ministerial duty exception, "a public officer or employee is not shielded from liability for the negligent performance of a purely ministerial duty." *Kimps*, 200 Wis. 2d at 10. "The test for determining whether a duty is discretionary (and therefore within the scope of immunity) or ministerial (and not so protected) is that the latter is found only when [the duty] is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id.* (internal citations omitted) (internal quotation marks omitted). "Second, the known danger exception operates in situations where an obviously hazardous situation exists and 'the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act.'" *Pries*, 2010 WI 63, ¶ 23 (citing *C.L. v. Olson*, 143 Wis. 2d 701, 715, 422 N.W. 2d 614, 619 (1988)). "This exception is a very limited one, having rarely been asserted successfully." *Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81, 95, 596 N.W. 2d 417, 424 (1999). "The two exceptions overlap to an extent, inasmuch as they both require the identification of a ministerial duty." *Pries*, 2010 WI 63, ¶ 23.

The Court concludes that Kemper, Malone and Howard are entitled to governmental immunity because: (1) maintenance of the basketball courts was a not a ministerial duty assigned to any of the defendants; and (2) no

reasonable jury could find that the Milwaukee Unit's court was "so obviously hazardous" so as to justify the known danger exception.

With regard to the duty to maintain the basketball courts at RCI, at all times relevant, matters involving maintenance of the buildings and grounds were routinely addressed by staff members of the Building and Grounds Department. (Docket #68 ¶ 29). The Supervisor of Maintenance has, at all times relevant, been Mr. Potratz. (Docket #68 ¶ 29). Although Kemper and Malone regularly attended meetings with Mr. Potratz, the Buildings and Grounds Superintendent, and the correctional management services director, these meetings were generally dedicated to discussing on-going maintenance issues. (Docket #68 ¶ 31). Nothing about these meetings, or the job descriptions of Kemper, Malone and/or Howard, impose upon the defendants the "specific task" or duty of repairing the basketball courts; nor was this duty "absolute, certain and imperative." *Kimps*, 200 Wis. 2d at 10. Similarly, there is no suggestion that any RCI policy prescribed "the time, mode and occasion for" basketball court maintenance. *Id.*

Rather, maintenance of the courts, like the overall maintenance of the building and grounds at RCI, was handled according to a careful prioritization of need and budget constraints. (Docket #68 ¶ 31). It is true, as Williams suggests, that in 2013-2014 the Building and Grounds Department discussed re-surfacing the courts. (Docket #68 ¶ 32). However, this re-surfacing was contemplated to be part of the overall goal of maintenance of the prison grounds. (Docket #68 ¶ 34). This is because none of the defendants had become aware of hazardous conditions on the courts and/or repeated injuries associated with the courts. (Docket #68 ¶¶ 25, 34). Because there was not a prescription of the "time, place, or manner" for the completion of this

overall goal, any duty flowing from the 2013-2014 re-surfacing meeting was discretionary and non-ministerial in nature. *Kimps*, 200 Wis. 2d at 10.

Moreover, there are no facts in the record from which a reasonable jury could conclude that the basketball courts presented an obvious hazard. *Pries*, 2010 WI 63, ¶ 23; *cf. Cords v. Anderson*, 80 Wis.2d 525, 532, 259 N.W.2d 672 (1977) (concluding that a park trail's obvious drop-offs and location near the edge of a high bluff were sufficiently dangerous to give rise to the park manager's "absolute, certain, and imperative duty" to close the trail, place warning signs, notify his superiors, or otherwise ensure adequate protection of the public who had been invited to use the park). Despite the fact that the Milwaukee Unit's court had some "cracks," none of defendants considered the court to be in such a state of disrepair as to constitute a hazard to the inmates playing on it. (Docket #74 ¶¶ 16-17, 20, 27; *see also* Figures 1-2). Williams likewise presented no evidence of other injuries sustained as a result of the court's condition.

Case 2:15-cv-00317-JPS   Filed 02/26/16   Page 23 of 28   Document 103



Figure 1: Milwaukee Unit Basketball Court (Docket #58, Ex. 2



Figure 2: Milwaukee Unit Basketball Hoop Close-Up (Docket #58, Ex. 2)

Page 24 of 28

What is more, Kemper, Malone and Howard are likewise entitled to recreational immunity pursuant to Wis. Stat. Ann. § 895.52. That statute provides that "no owner and no officer, employee or agent of an owner owes to any person who enters the owner's property to engage in a recreational activity: (1) [a] duty to keep the property safe for recreational activities; (2) [a] duty to inspect the property…; [or] (3) [a] duty to give warning of an unsafe condition, use or activity on the property." Wis. Stat. Ann. §895.52(2)(a). In addition, "no owner and no officer, employee or agent of an owner is liable for…injury caused by a person engaging in a recreational activity on the owner's property…." Wis. Stat. Ann. § 895.52(2)(b). The statute defines: (1) "injury" to mean "an injury to a person or to property"; (2) an "owner" to mean "[a] person, including a governmental body or nonprofit organization, that owns, leases or occupies property"; (3) "property" to mean "real property and buildings, structures and improvements thereon, and the waters of the state"; and (4) "recreational activity" to mean "any outdoor activity undertaken for the purpose of exercise, relaxation or pleasure.…" Wis. Stat. Ann. §895.52(1) (b), (d), (f), (g).

When interpreting this statute, Wisconsin courts have instructed:

> for immunity to apply, certain conditions must exist. First, as here, the claimant's injuries must have been sustained during recreational activity. Next, the allegedly negligent party must be an owner of the property where the injury occurred. There are some circumstances under which immunity will not apply, but courts are to liberally construe the statute in favor of property owners.

*Held v. Ackerville Snowmobile Club, Inc.*, 2007 WI App 43, ¶ 8, 300 Wis. 2d 498, 503, 730 N.W. 2d 428, 430-31 (internal citations omitted) (internal quotation marks omitted).

As stated by *Held*, there is no dispute that: (1) Williams' knee injury was sustained during a game of basketball; and (2) Kemper, Malone and Howard were employees of a governmental body—the State of Wisconsin—that owned the basketball court where the incident occurred. (Docket #68 ¶ 22). Thus, under the plain terms of the statute and the case law interpreting it, Kemper, Howard and Malone are entitled to recreational immunity in this case.

To conclude, there is no evidence to suggest that the defendants' duties to maintain the basketball courts at RCI were anything other than discretionary and non-ministerial. *See Pries*, 2010 WI 63, ¶ 23. Moreover, no reasonable jury could conclude that the condition of the Milwaukee Unit basketball court presented an obvious danger, the nature of which was compelling and known to the defendants. *Id.* Therefore, Kemper, Malone and Howard are entitled to governmental immunity on Williams' state law negligence claim. In addition, Kemper, Malone and Howard are likewise entitled to recreational immunity under Wis. Stat. Ann. § 895.52. The defendants' motion for summary judgment on this claim (Docket #66) will be granted, and Williams' motion for summary judgement on this claim (Docket #54) will be denied.

4.      CONCLUSION

Williams' claims cannot proceed beyond summary judgment. The undisputed facts demonstrate that neither Vasquez nor Nygren, in their supervisory capacities, violated Williams' Eighth Amendment rights. In

addition, Kemper, Malone and Howard are entitled to both governmental and recreational immunity, and thus cannot be held liable for a negligence claim arising from Williams' knee injury on the basketball court. Thus, the defendants' motion for summary judgment (Docket #66) will be granted, and Williams' motion for summary judgment (Docket #54) will be denied.

In addition, the Court will deny Williams' request to bring a criminal action against the defendants for perjury. (Docket #96). Criminal actions must be initiated by the government.

Accordingly,

IT IS ORDERED that the Williams' motion for summary judgment (Docket #54) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #66) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits;

IT IS FURTHER ORDERED that Williams' motion to pursue a criminal claim (Docket #96) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that Williams' motion for a preliminary injunction (Docket #101) be and the same is hereby DENIED.[22]

---

[22]Williams filed this motion for a "preliminary" injunction on February 25, 2016. (Docket #101). However, this injunction relates to his theory that the defendants violated his Eighth Amendment rights by failing to take him to his final ortho follow-up appointments. (Docket #101). The Court has addressed this argument above and concluded that: (1) the theory was not properly raised in Williams' complaint; and (2) the argument has no merit because neither Nygren nor Vasquez acted with deliberate indifference with respect to Williams' purported appointments. (*See supra*, Part 3.1). In light of the Court's conclusion, a preliminary injunction flowing from this alleged conduct is inappropriate and Williams' motion will therefore be denied.

Case 2:15-cv-00317-JPS   Filed 02/26/16   Page 27 of 28   Document 103

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of February, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge